# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **VINCENT LAMONT** | ) | |
| **WOODHOUSE,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:17cv00129 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **UNIT MANAGER DUNCAN, et al.,**) | | By: Pamela Meade Sargent |
| Defendants | ) | United States Magistrate Judge |

The pro se plaintiff, Vincent Lamont Woodhouse, ("Woodhouse"), an inmate incarcerated at Red Onion State Prison, ("Red Onion"), brings this civil rights action pursuant to 42 U.S.C. § 1983 against the defendants -- Duncan, Unit Manager; Kiser, Warden of Red Onion; Artrip, Assistant Warden; Gallihar, E.B.P. Manager; Swiney, Unit Manager; Geraldine Baker, T.P.S.; Lt. Kiser; Lt. Stanley; Correctional Officer Miller; Counselor Sowards; Counselor Stallard; Counselor Kegley; Counselor Jonathan M. Gibson; Ingrim, Regional Administrator; J. B. Messer, Grievance Coordinator; Adams, Investigator; Lt. Fannin, Investigator; Lt. McQueen, Investigator; C. Michael Younce, Unit Manager; and Harold Clarke, Director of the Virginia Department of Corrections, ("VDOC").[1] Woodhouse asserts various claims arising from his long-term placement in segregation housing and his brief transfer to a step down unit on February 13, 2017.

This matter is before the undersigned magistrate judge on the Defendants' Motion For Summary Judgment, (Docket Item No. 32) ("Motion"), on referral

---

[1] The court is aware that the plaintiff misspelled a number of the defendants' names in his Complaint.

pursuant to 28 U.S.C. § 636(b)(1)(B) for a report setting forth appropriate findings of fact and conclusions of law and recommended disposition. The Motion seeks the entry of summary judgment on the plaintiff's claims based, in part, on his failure to exhaust his administrative remedies before filing suit. An evidentiary hearing was held before the undersigned on September 5, 2017.

## I. Facts

In his sworn Complaint, (Docket Item No. 1), Woodhouse alleged numerous violations of his constitutional rights. Specifically, Woodhouse alleged:

1.  He has been held in segregation at Red Onion under harsh conditions since 2012;

2.  He was denied witnesses in violation of his due process rights at a December 30, 2016, Institutional Classification Authority, ("ICA"), hearing;

3.  On January 11, 2017, Unit Manager Duncan came to his cell door to conduct an ICA hearing and told Woodhouse that his security level would be decreased from an "S" for segregation to a Level 6. Duncan told Woodhouse that he would be moved to the step down phase 1 unit. Woodhouse said that he told Duncan that he was at risk of being attacked by Blood gang members, and he requested to be placed in protective custody. Duncan denied this request;

4.  On January 15, 2017, Woodhouse told defendant Gallihar that he was at risk of being harmed by Blood gang members if placed in general population. Woodhouse said that he told Gallihar that he needed to be

placed in protective custody. He said that Gallihar responded, "you either go to phase 1 or rot is seg[regation];"

5.  On January 18, 2017, after Woodhouse filed enemy forms, Counselor Stallard told him "I hope those Bloods kill you in phase 1, since you want to do paperwork;"

6.  On January 20, 2017, Woodhouse told Geraldine Baker that the Bloods wanted to kill him, and Baker responded, "I know all about it; I don't give a fuck this is red neck ville;"

7.  On January 23, 2017, Woodhouse advised defendant Ingrim that he had been in segregation for eight years and that he risked being harmed by Blood gang members if he was not placed in protective custody. He said Ingrim just walked away;

8.  On January 27, 2017, Lt. Kiser and Counselor Sowards came to Woodhouse's cell door and conducted an ICA hearing. Woodhouse was not allowed to call QMHP Trent as a witness. Woodhouse told Kiser and Sowards that he was at risk of being attacked by Blood gang members in general population, and Kiser told him, "I understand that but the decision to send you to step down phase one population came from … Gallihar and I cannot disobey his orders;"

9.  On February 3, 2017, another ICA hearing was conducted at Woodhouse's cell door by Lt. Stanley and Sowards. Woodhouse advised them that he was at risk of being attacked by Blood gang members in general population, but Stanley and Sowards recommended that he be placed in step down phase 1. Duncan reviewed and approved of this recommendation;

10. On February 13, 2017, Correctional Officer Miller forced Woodhouse to leave segregation. Miller told Woodhouse, "if you don't move we will stop feeding you;"

11. Woodhouse recognized three Blood gang members housed in the step down phase 1 unit where he was moved on February 13, 2017. The next day, one of the Blood gang members told him "I'm a get the [correctional officer] in the booth to pop your door and I'm going in that cell." When Stallard came to his cell door, Woodhouse asked Stallard why he had been placed in population when it was documented that he was at risk of attack by Blood gang members. Woodhouse told Stallard that he was going to file a lawsuit, and Stallard replied, "I don't give a fuck about your paperwork, I dare you to try to write it up, you'll never get a response. I might get Swiney to beat [your] ass again if you try to write me up!"

12. On February 24, 2017, Stallard served Woodhouse with a notice of an ICA hearing, and his three requested witnesses were denied; and

13. Swiney and Stallard conducted an ICA hearing at Woodhouse's cell door on February 27, 2017. Swiney denied his request to be placed in protective custody and said, "I don't put niggers on [protective custody]." Swiney also threatened Woodhouse with bodily harm and stated, "We don't do grievances here."

In support of their Motion, the defendants filed an Affidavit from J. Messer, the Institutional Ombudsman at Red Onion. (Docket Item No. 33-1) ("Messer Affidavit"). In her affidavit, Messer stated that Operating Procedure, ("OP"), 866.1, Offender Grievance Procedure, is a mechanism for VDOC offenders to resolve complaints, appeal administrative decisions and challenge procedures.

Messer said that the administrative process provided corrections officials with a means to assess potential problems, and, if necessary, correct those problems in a timely manner. A copy of OP 866.1 was attached to Messer's Affidavit. (Docket Item No. 33-1 at 7-20.) Under OP 866.1, all issues are grieveable except those pertaining to policies, procedures and decisions of the Virginia Parole Board, disciplinary hearings, state and federal court decisions, laws and regulations and other matters beyond the control of the VDOC. (OP 866.1 at 5.)

According to Messer, grievances which do not meet the filing requirements of OP 866.1 are returned to the offender within two working days from the date of receipt, noting the reason for return on the intake section of the grievance form. (Messer Affidavit at 3; OP 866.1 at 8.) The offender is instructed how to remedy any problems with the grievance when feasible. (Messer Affidavit at 3.) If an offender wishes review of the intake decision on any grievance, he may send the grievance to the applicable Regional Ombudsman for a determination. (Messer Affidavit at 3; OP 866.1 at 9.) There is no further review of the intake decision. (Messer Affidavit at 3; OP 866.1 at 9.)

A review of OP 866.1 shows that it requires complete exhaustion. OP 866.1 states:

> An offender meets the exhaustion of remedies requirement only when a Regular Grievance has been carried through the highest eligible level of appeal without satisfactory resolution of the issue.
> … If a Regular Grievance does not meet the criteria for acceptance and review by the Regional Ombudsman does not result in intake into the grievance process, the issue must be resubmitted in accordance with the criteria for acceptance. The exhaustion of remedies requirement will be met only when the Regular Grievance

has been accepted into the grievance process and appealed through the highest eligible level without satisfactory resolution of the issue.

(OP 866.1 at 6.)

Prior to submitting a regular grievance, the offender must demonstrate that he has made a good faith effort to informally resolve his complaint, which may be accomplished by submitting an informal complaint to the Grievance Department at the appropriate institution. (Messer Affidavit at 3-4; OP 866.1 at 6.) The informal complaint will then be forwarded to the appropriate department head. (Messer Affidavit at 4.) Prison staff should respond to an informal complaint within 15 calendar days to ensure that informal responses are provided prior to the expiration of the 30-day time period in which an offender may file his regular grievance. (Messer Affidavit at 4; OP 866.1 at 7.) Regular grievances are to be submitted within 30 days from the date of the occurrence/incident. (Messer Affidavit at 3; OP 866.1 at 7.)  The grievance must include any required documentation, including the informal complaint, showing the offender's attempt to informally resolve the issue. (Messer Affidavit at 4; OP 866.1 at 8.)

There are three possible levels of review available for regular grievances that are accepted at intake. (Messer Affidavit at 4; OP 866.1 at 9.) Level I reviews are conducted by the Warden or Superintendent of the facility where the offender is located. (Messer Affidavit at 4; OP 866.1 at 9.) If the offender is dissatisfied with the Level I determination, he may appeal to Level II. (Messer Affidavit at 4.) Level II reviews are conducted by the Regional Administrator, Health Services Director, Chief of Operations for Offender Management Services or Superintendent for Education. (Messer Affidavit at 4; OP 866.1 at 10.) For most issues, Level II is the final level of review. (Messer Affidavit at 4.) For those issues appealable to Level

III, the Chief of Corrections Operations or Director of the VDOC conducts a review of the regular grievance. (Messer Affidavit at 4; OP 866.1 at 10.) The time limit for issuing a Level I response is 30 days, 20 days for a Level II response and 20 days for a Level III response. (Messer Affidavit at 4; OP 866.1 at 11.) Expiration of the time limit without issuance of a response at any stage of the process automatically qualifies the grievance for appeal to the next level of review. (Messer Affidavit at 4; OP 866.1 at 11.)

According to Messer, Red Onion's grievance office on January 4, 2017, received a regular grievance from Woodhouse in which he complained that a dismissed disciplinary charge had resulted in changes to his classification status. (Messer Affidavit at 4, 21.) Messer said that she rejected the grievance at intake because it pertained to the disciplinary procedure, and Woodhouse did not appeal her intake decision. (Messer Affidavit at 4-5, 22.) Messer stated that another regular grievance was received from Woodhouse on February 1, 2017, in which he appealed his 90-day ICA review. (Messer Affidavit at 5, 23-24.) Woodhouse alleged that his due process rights had been violated when QMHP Trent chose not to attend his January 27, 2017, ICA hearing. (Messer Affidavit at 5.) Assistant Warden Artrip deemed the grievance unfounded. (Messer Affidavit at 5, 25.) Messer said that Woodhouse did not appeal his decision to Level II. (Messer Affidavit at 5.)

Messer stated that another regular grievance was received from Woodhouse on March 7, 2017, in which he complained that prison officials had acted with deliberate indifference on February 13, 2017, by placing him in the step down program with Blood gang members. (Messer Affidavit at 5, 27.) Woodhouse also complained about general population and the use of segregation for indefinite

confinement. (Messer Affidavit at 5.) Messer said that she determined that this grievance contained insufficient information to determine the main concern of the grievance, and she instructed Woodhouse to rewrite and resubmit the grievance, if his intention was to grieve his housing status. (Messer Affidavit at 5, 28.) Messer rejected the grievance on intake and returned it to Woodhouse. (Messer Affidavit at 5.) Messer said that Woodhouse did not resubmit the grievance or appeal the intake decision. (Messer Affidavit at 5.)

Messer said that another regular grievance was received from Woodhouse on March 9, 2017, in which he complained about his segregation housing assignment, enemy issues, Blood gang members, his assignment to the step down program and his request to be assigned to protective custody. (Messer Affidavit at 5, 30.) Messer rejected this grievance at intake and returned it to Woodhouse with instructions to resubmit the grievance with only one issue. (Messer Affidavit at 6, 31.) Woodhouse did not resubmit the grievance or appeal the intake decision. (Messer Affidavit at 6.) Messer said that Woodhouse has not submitted any other grievance regarding the claims in this lawsuit. (Messer Affidavit at 6.)

At the evidentiary hearing, Woodhouse testified that he had been threatened by Red Onion staff members if he sought administrative remedies. In particular, Woodhouse said that, after he was moved to step down phase 1 on February 14, 2017, he told Stallard he was going to file a lawsuit. He said that Stallard replied, "I don't care about your paperwork. … I will get Swiney to bust your ass again." Woodhouse said that he took that as a threat not to attempt to exhaust his administrative remedies. Woodhouse also testified that inmates in the step down phase 1 program had to receive administrative remedy forms from a supervisor, and he said he never saw a supervisor. Nonetheless, Woodhouse testified that he

fully exhausted his administrative remedies as to all claims raised in his Complaint. Woodhouse said that he did not file an informal complaint form over being placed in step down phase 1 because it was a classification matter and could be appealed by filing a regular grievance form.

Woodhouse testified that he did appeal Messer's rejection at intake of the regular grievance he filed on March 8, 2017, by sending it by U.S. Postal Service to the Regional Ombudsman. Woodhouse stated that he gave his appeal to an officer, who he could not remember, to place in the mail on the same day he received Messer's intake decision, March 14, 2017. He said that he never received a response to his appeal from the Regional Ombudsman. Woodhouse further stated that OP 866.1 did not state what to do if an inmate did not receive a response to an appeal of an intake decision. Woodhouse also testified that Messer's rejection of this regular grievance on March 14, 2017, violated policy, in that she was supposed to advise him of her intake decision within two working days of its filing.

Woodhouse testified that he also appealed Messer's rejection at intake of the regular grievances he filed on February 1, 2017, and March 3, 2017. He said that he appealed these rejections by mailing his appeals to the Regional Ombudsman, too.  He did not say to whom he gave these mailings or when they were mailed. He said that he never received any responses to these appeals. Woodhouse also testified that he did not keep a copy of any of these appeals. Woodhouse also filed an affidavit in opposition to the defendants' Motion. (Docket Item No. 44-2.) In the affidavit, Woodhouse stated only that he appealed all the relevant unfavorable administrative remedies decisions by placing his appeals in the mail to the Regional Ombudsman. Woodhouse submitted four affidavits into evidence at the evidentiary hearing, in which he said that he appealed all the relevant unfavorable

administrative decisions by placing his appeals in the mail. (Plaintiff's Exhibit Nos. 2-5, Docket Item Nos. 67-2 to 67-5.)

On cross-examination, Woodhouse admitted that he sent a letter to the Regional Ombudsman on March 14, 2017, the same day that he testified that he sent the Regional Ombudsman an appeal of one of Messer's intake decisions. (Defense Exhibit No. 1, (Docket Item No. 67-6.)) In this letter, Woodhouse complained of failing to get Level I responses to the grievances he filed. Woodhouse admitted that he did not mention any complaint of not receiving responses from the Regional Ombudsman to his appeals of Messer's intake decisions in this letter.

Inmate Alfonza Greenhill also testified. According to Greenhill, in the eight years he had been incarcerated at Red Onion, he had been denied access to both informal complaint and regular grievance forms. He said that this had occurred so many times that he had lost count. He also testified that he had filed numerous administrative remedies requests to which he had never received any response. Greenhill did admit that he had successfully exhausted his administrative remedies on some issues, but he claimed that these requests dealt with religious issues and did not pertain to correctional officer misconduct. Greenhill said that, if he filed any form pertaining to correctional officers, he never received any response, and, if he received a response and appealed it, he never received a response on appeal. Greenhill also testified that, when he would ask a correctional officer for a complaint or grievance form, the officer would want to know why he needed a form.

Messer, the Red Onion Grievance Coordinator, testified that Woodhouse has successfully filed and appealed intake decisions in the past. Messer admitted, however, that she would have no way of knowing whether Woodhouse had ever mailed his appeal of her intake decisions, if the appeal did not make it to the Regional Ombudsman. She agreed that she did not know whether Woodhouse had attempted to appeal any intake decision by mailing an appeal that was not delivered. Messer also agreed that she violated OP 866.1 when it took her five days to respond to Woodhouse's regular grievance filed on March 8, 2017. She stated, however, that Woodhouse's appeal period would have begun from the date that he received her response.

Messer also stated that in a typical month, her office at Red Onion logs in approximately 50 regular grievances and rejects approximately 100 at intake.

## II. Analysis

The Prison Litigation Reform Act of 1995, ("PLRA"), requires a prisoner to exhaust any available administrative remedies before challenging prison conditions in federal court. *See* 42 U.S.C.A. § 1997e(a) (West 2012). It provides as follows: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e(a). Exhaustion is mandatory under § 1997e(a), and courts have no discretion to waive the requirement. *See Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)); *Porter v. Nussle*, 534 U.S. 516, 524 (2002). "[F]ailure to exhaust is an affirmative defense under the PLRA" and, therefore, must be both pled and proven by the defendants.

*Jones v. Bock*, 549 U.S. 199, 216 (2007). A prisoner must exhaust administrative remedies even where the relief sought, such as monetary damages, cannot be granted by the administrative process. *See Woodford*, 548 U.S. at 85 (citing *Booth*, 532 U.S. at 734).

The Supreme Court has instructed that the PLRA also "requires proper exhaustion." *Woodford*, 548 U.S. at 93. Proper exhaustion of administrative remedies for PLRA purposes means using all steps that the agency holds out, and doing so properly, so that the agency addresses the issues on the merits. *See Woodford*, 548 U.S. at 90. Therefore, in order to satisfy the exhaustion requirement, an inmate must file a grievance raising the claim and pursue the grievance through all available levels of appeal, prior to bringing his action to court. *See Woodford*, 548 U.S. at 90.

Thus, before Woodhouse may proceed with his claims in this court, he must first have exhausted the administrative remedies available to him through the VDOC pursuant to OP 866.1. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). "[W]hen prison officials prevent inmates from using the administrative process …, the process that exists on paper becomes unavailable in reality." *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

Furthermore, the exhaustion of administrative remedies under the PLRA is a question of law to be determined by the court. *See Drippe v. Tobelinski,* 604 F.3d 778, 782 (3d Cir. 2010); *see also Messa v. Goord,* 652 F.3d 305, 308 (2d Cir. 2011); *Dillon v. Rogers,* 596 F.3d 260, 272 (5th Cir. 2010); *Bryant v. Rich,* 530

F.3d 1368, 1375–77 & n.15 (11th Cir. 2008); *Pavey v. Conley,* 544 F.3d 739, 741–
42 (7th Cir. 2008); *Wyatt v. Terhune,* 315 F.3d 1108, 1119–20 (9th Cir. 2003)
(overruled on other grounds).

The evidence before the court shows that Woodhouse filed four regular
grievances with regard to the claims raised in this case. On January 1, 2017,
Woodhouse filed a regular grievance challenging being held in segregation at Red
Onion. (Docket Item No. 33-1 at 21.) This grievance was rejected at intake on
January 4, 2017, because it complained of a disciplinary hearing decision, which
was not grievable. On January 30, 2017, Woodhouse filed a regular grievance
complaining about QMHP Trent not appearing at his recent ICA hearing. (R. at 33-
1 at 24.) Woodhouse also appeared to be complaining of being held in segregation.
The grievance was accepted on intake, and it was determined on Level I review to
be unfounded. (R. at 33-1 at 25.) On March 3, 2017, Woodhouse filed a regular
grievance complaining about being placed in the step down unit with Blood gang
members on February 13, 2017. (R. at 33-1 at 27.) This grievance was rejected on
intake based on insufficient information. (R. at 33-1 at 28.) Woodhouse was
instructed to rewrite and resubmit the grievance if he wanted to grieve his housing
status. On March 8, 2017, Woodhouse filed a regular grievance raising a number
of complaints, including the length of time he had been held in segregation, being
placed in step down phase 1 with members of the Blood gang and requesting an
ICA hearing and designation to protective custody. (R. at 33-1 at 30.) This
grievance was rejected for raising more than one issue. (R. at 33-1 at 31.)

Defendants have provided evidence from Messer stating that Woodhouse
has not exhausted his administrative remedies as to any of his claims because he
did not appeal the unfavorable decisions on each of the grievances. Woodhouse has

testified that he appealed each unfavorable decision. With regard to the three grievances rejected at intake, Woodhouse testified that he had appealed these decisions by mailing appeals to the Regional Ombudsman. Woodhouse stated that he never received any response to these appeals from the Regional Ombudsman. Woodhouse argued that these actions exhausted his administrative remedies because OP 866.1 did not state what he should do if he did not receive a response of his appeal of an intake rejection.

A review of OP 866.1, however, shows that this is not accurate.  OP 866.1 states:

> If a Regular Grievance does not meet the criteria for acceptance and review by the Regional Ombudsman does not result in intake into the grievance process, the issue must be resubmitted in accordance with the criteria for acceptance.  The exhaustion of remedies requirement will be met only when the Regular Grievance has been accepted into the grievance process and appealed through the highest eligible level without satisfactory resolution of the issue.

(OP 866.1 at 6.) Thus, OP 866.1 notifies an inmate that, if his grievance is not accepted at intake, he must resubmit another grievance. The uncontradicted evidence is that Woodhouse did not submit another grievance for any of his three grievances rejected at intake. Therefore, with regard to these grievances, I find that Woodhouse did not exhaust his administrative remedies as required.

With regard to the one grievance that was accepted on intake and determined unfounded at the Level I review, the uncontradicted evidence shows that Woodhouse did not exhaust his administrative remedies as to the issues raised by

this grievance either. OP 866.1 states:

> Expiration of a time limit (to include any authorized continuance) at any stage of the process shall be considered a denial and shall qualify the grievance for appeal to the next level of review.

(OP 866.1 at 11.) Woodhouse claims that he appealed this grievance to Level II but never received any decision. OP 866.1 gives the responding official only 20 calendar days to respond on a Level II review. When Woodhouse received no response within this period of time, he should have appealed the grievance to the next level of review. Woodhouse offered no evidence that he did so. Therefore, the uncontradicted evidence is that Woodhouse did not exhaust his administrative remedies as to the issues presented in this grievance.

I also find incredible Woodhouse's testimony that he did appeal each unfavorable decision of these grievances. To believe Woodhouse, I would have to believe that on four separate occasions a correctional officer either unintentionally or intentionally did not place Woodhouse's appeals in the outgoing mail or that the U.S. Postal Service lost all four mailings and did not deliver them to the Regional Ombudsman's office. I find this unlikely. I also note the fact that Woodhouse kept no copies of these appeals and that he provided the court with no testimony as to whom he delivered his appeals for mailing or when he did so hurts his credibility. Since none of these appeals were ever received by the Regional Ombudsman, I find the more likely scenario is that Woodhouse did not mail these appeals.

Based on my findings as to Woodhouse's failure to exhaust his administrative remedies, I do not address the defendants' other arguments raised in their Motion.

## PROPOSED FINDINGS OF FACTS AND
## CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.      Woodhouse did not exhaust his administrative remedies with regard to his claims before filing suit; and

2.      Judgment should be entered in the defendants' favor on Woodhouse's claims.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend the court grant the Motion and enter judgment in the defendants' favor on Woodhouse's claims based on his failure to exhaust his administrative remedies.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The

judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Michael F. Urbanski, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED:  January 10, 2017.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE